1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT
7                       FOR THE DISTRICT OF ARIZONA
8
9   Dream Games of Arizona, Inc., et al.,  )   No. CIV 03-0433-PHX-EHC
                                            )
10              Plaintiffs,                 )   **ORDER**
                                            )
11  vs.                                     )
                                            )
12                                          )
    PC Onsite, L.L.C., et al.,              )
13                                          )
                Defendants.                 )
14                                          )
                                            )
15  _____    )

16          Before the Court are several fully briefed motions, including cross-motions for

17  summary judgment.

18          **Background**

19          Plaintiff Dream Games of Arizona, Inc., an Arizona corporation, creates, designs,

20  develops, licenses and sells electronics video games. Plaintiff American Software

21  Development Company, Inc. ("American Software"), an Arizona corporation, is the

22  licensor of Fast Action Bingo. American Software also has the authority to assign

23  distribution agreements to distributors of Fast Action Bingo.

24          Defendant PC Onsite, L.L.C. is an Arizona limited liability company. PC Onsite

25  licenses, distributes, and sells computer hardware and software. PC Onsite developed an

26  electronic video bingo game known as Quick Play Bingo. Defendant Casey Hagon, an

27  Arizona resident, oversees PC Onsite's software development.  Defendant Garland Pierce

28  is employed as a programmer by PC Onsite.

1    Defendant City Entertainment, L.L.C. ("City Entertainment"), a Utah limited

2   liability company, owns and operates two bingo rooms in Wyoming. Pursuant to a

3   licensing agreement with PC Onsite dated January 3, 2003, City Entertainment is the

4   exclusive distributor of Quick Play Bingo.  Defendant Frank Diana ("Diana") is the sole

5   owner of City Entertainment and is also Daniel's partner in forming City Entertainment.[1]

6   Diana and Warren Daniel formed City Entertainment in the summer of 2001 for the

7   purpose of building a facility to house a commercial bingo room.  Diana also owns a fifty

8   percent interest in both Mountain View Leasing, L.L.C. and Blue Sky Entertainment,

9   which together own and operate four bingo rooms in Utah and Wyoming.

10    In 1997, Dream Games created a computer program for the electronic video game

11   Fast Action Bingo. In March of 2002, Warren Daniel ("Daniel"), the president of

12   Affordable Video Systems, Ltd. ("Affordable Video"), a licensed distributor of Fast

13   Action Bingo,[2] introduced Third Party Defendant Paul Perez, president of Dream Games

14   and American Software, to Hagon of PC Onsite. Perez and Hagon discussed the

15   possibility of PC Onsite developing graphic enhancements for Fast Action Bingo and

16   writing the game in a new language.

17    Perez gave PC Onsite the source code and full operating system for Fast Action

18   Bingo. On March 29, 2002, Hagon signed a Non-Disclosure Agreement on behalf of PC

19   Onsite with respect to Fast Action Bingo's source code. The Non-Disclosure Agreement

20   lists Dream Games as the licensor and PC Onsite as the licensee. The Non-Disclosure

21   Agreement provided that Dream Games would retain all intellectual property rights in the

22   proprietary information it provided to PC Onsite, and that "no title or ownership of the

23   Proprietary Information . . . is hereby transferred to Licensee [PC Onsite]." The Non-

24

25

26    [1]City Entertainment and Frank Diana were dismissed by Stipulation on August 29, 2003. Dkt. 78.

27    [2]Affordable Video Systems was dismissed by Stipulation on August 29, 2003. Dkt.

28   78.

1  Disclosure Agreement also included PC Onsite's Agreement "not to assign, sell,

2  distribute, license or otherwise transfer the Proprietary Information."

3  Defendants allege that Hagon received an inter-office memo around July 11, 2002,

4  indicating PC Onsite was unable to open the source code contained on the Fast Action

5  Bingo source code disk that Perez supplied to PC Onsite. On July 23, 2002, Perez paid

6  PC Onsite $7,500 toward the costs of the work he was hiring PC Onsite to do, including

7  adding graphic enhancements to Fast Action Bingo and possibly programming the game

8  in a new language. In late July 2002, Perez supplied PC Onsite with a 586 computer, a

9  Stallion all-in-one touch screen computer, and a 14-inch monitor.  Perez also supplied PC

10  Onsite with a demo of Fast Action Bingo, which PC Onsite reviewed.

11  Perez and PC Onsite spent approximately two months on negotiations and

12  development of a new enhanced version of Fast Action Bingo. Over the two-month

13  period, Perez and PC Onsite conducted several development meetings. The parties

14  dispute whether Hagon informed Perez during two July 2002 meetings that PC Onsite

15  could not open up the Fast Action Bingo source code. During these meetings, Perez and

16  PC Onsite discussed enhancing the graphics of the player's screen.

17  In September 2002, PC Onsite and Perez had a meeting regarding PC Onsite's

18  work on Fast Action Bingo, at which time PC Onsite presented to Perez the full Fast

19  Action Bingo project, including enhancements. However, the parties disagreed as to who

20  would own the enhanced version of Fast Action Bingo. The parties failed to reach an

21  agreement, after which Perez instructed PC Onsite to destroy the Fast Action Bingo

22  source code disk. On November 27, 2002, Dream Games registered Fast Action Bingo

23  with the Copyright Office as United States Copyright Registration No. TX 5-622-656.

24  Dream Games lists the nature of authorship as "ENTIRE TEXT OF COMPUTER

25  PROGRAM."

26  Hagon worked on a new game for Perez, which Hagon called "Bingo 1972," now

27  referred to as "Quick Play Bingo." Quick Play Bingo is an electronic video bingo game

28  that competes with Fast Action Bingo.

On May 22, 2002, American Software and Affordable Video entered into placement agreement with Southgate Social Club (the "Southgate Placement Agreement"), pursuant to which American Software extended a license to Southgate Social Club for the operation of Fast Action Bingo at Southgate Social Club for two years. Dkt. 1, Exh. D. Daniel executed the Southgate Placement Agreement on behalf of both Affordable Video and Southgate Social Club.  Under the Southgate Placement Agreement, American Software was to receive twenty-five percent (25%) of revenue (i.e., the dollars played minus the winnings) generated by the Fast Action Bingo machines placed at Southgate.  The Southgate Placement Agreement contains a term that Southgate Social Club "shall not permit the operation of any other game that is similar to 'Fast Action Bingo' . . . provided that [American Software's] hardware, software, tech support and maintenance is, as good as or equal to, products being offered in the marketplace by other vendors."  On January 20, 2003, Diana ordered that ten of the twenty-four Fast Action Bingo machine systems then in operation at Southgate Social Club be removed from operation and replaced with twelve Quick Play Bingo machine systems. On February 20, 2003, Diana removed the remaining fourteen Fast Action Bingo units from the Southgate Social Club.

On May 22, 2002, American Software and Affordable Video granted a license to Galaxy Bingo (the "Galaxy Placement Agreement") to operate Fast Action Bingo. Dkt. 1, Exh. E. Daniel executed the Galaxy Placement Agreement on behalf of both Affordable Video and Galaxy Bingo. Under the Galaxy Placement Agreement, American Software was to receive twenty-five percent (25%) of revenue (i.e., the dollars played minus the winnings) generated by the Fast Action Bingo machines placed at Galaxy Bingo. The Galaxy Placement Agreement contains a term that Galaxy Bingo "shall not permit the operation of any other game that is similar to 'Fast Action Bingo' . . . provided that [American Software's] hardware, software, tech support and maintenance is, as good as or equal to, products being offered in the marketplace by other vendors." The Galaxy Placement Agreement was to last for two years beginning May 22, 2002.

1   Plaintiffs filed the Complaint on March 5, 2003. Dkt. 1. The Court granted

2   Plaintiffs a Temporary Restraining Order on March 12, 2003, Dks. 13 and 15, and a

3   Preliminary Injunction on April 18, 2003. Dkt. 67.

4   **Defendants' First Motion for Partial Summary Judgment**

5   Defendants have filed a Motion for Partial Summary Judgment, Dkt. 108, and an

6   accompanying Statement of Facts, Dkt. 109. Plaintiffs responded, Dkt. 123, and filed a

7   Statement of Facts. Defendants replied. Dkt. 128.

8   Defendants argue that Fast Action Bingo is illegal in Utah and Wyoming and that

9   the parties' contract to enhance Fast Action Bingo is therefore unenforceable. The

10   Constitution of Utah requires that "[t]he Legislature shall not authorize any game of

11   chance, lottery or gift enterprise under any pretense or for any purpose." Constitution of

12   Utah, Art. 6, § 27. The parties agree that "valuable consideration" must be exchanged for

13   the opportunity to play in order to run afoul of Utah's Constitution. Albertson's, Inc. v.

14   Hansen, 600 P.2d 982, 985 (1979). Plaintiffs argue that all Utah businesses where Fast

15   Action Bingo can be played offer the game as a bonus to the purchase of other services.

16   Most of the Utah business, for example, are eating establishments that let customers play

17   Fast Action Bingo at no additional price. All of these establishments allow people who

18   are not customers to play Fast Action Bingo for free. Law enforcement has made no

19   attempt to shut down any of these establishments, except for one which, unlike the others,

20   apparently sold Fast Action Bingo tickets, thus requiring "valuable consideration" to play.

21   Like Utah, Wyoming prohibits gambling, defined as "risking any property for gain

22   contingent in whole or in part upon lot, chance, [or] the operation of a gambling device."

23   Wyo. Stat. Ann.§ 6-7-101(a)(iii) (2004). There is an exception for "bingo conducted . . .

24   by charitable or nonprofit organizations where the tickets for the . . . bingo are sold only

25   in [Wyoming.]" Id. at § 6-7-101(a)(iii)(D). Fast Action Bingo has been operated in

26   Wyoming since 1998. In 2004, state law enforcement officials seized Fast Action Bingo

27   machines at two bingo halls in Platte County. Fast Action Bingo was voluntarily removed

28   from bingo halls in Laramie County, Sheridan County, Johnson County, and Hot Springs

1    County. Furthermore, a Wyoming state court, on January 5, 2005, found that Fast Action

2    Bingo machines are gambling devices. Dkt. 158. This decision is on appeal. Dkt. 159.

3    However, Fast Action Bingo is still being offered in other places in Wyoming, like Green

4    River, without the intervention of law enforcement.

5         "An agreement is unenforceable if the acts to be performed would be illegal or

6    violate public policy." Landi v. Arkules, 172 Ariz. 126, 133, 835 P.2d 458, 465

7    (App.1992). However, "[c]ourts should be hesitant to allow parties to escape their

8    [contractual] obligations under the pretext of public policy or illegality." Forsythe v.

9    BancBoston Mortg. Corp., 135 F.3d 1069, 1074 (6th Cir. 1997) (citation and internal

10   quotation marks omitted); see also Cohen v. Cowles Media Co., 479 N.W.2d 387, 391

11   (Minn. 1992) ("Courts should not invalidate enforceable promises" that arguably

12   contravene public policy "except in the clearest of cases."). A contract is not

13   unenforceable simply because a party in performing it may break the law; rather, "the

14   court inquires whether the contract *necessarily* contemplated an illegal bargain. . ."

15   Keating v. Estate of Golding, 277 Ill. App.3d 953, 661 N.E.2d 541, 544 (1995) (emphasis

16   added). In both Utah and Wyoming, Fast Action Bingo is being played openly, generally

17   without any law enforcement intervention. The Court will not refuse to enforce the

18   parties' contract based on the defense of illegality; summary judgment is denied as to this

19   point. For the same reasons, summary judgment is denied as to the Defendants' unclean

20   hands argument.

21        Defendants argue that Plaintiffs' Distribution Agreement and Placement

22   Agreement for Fast Action Bingo constitutes copyright misuse, because the Agreements

23   bar the use of any other game that is "similar to Fast Action Bingo." See Dkt. 1, Exh. D

24   ¶10 and E ¶10.

25        "[M]isuse is a defense to copyright infringement." Practice Management

26   Information Corp. v. American Medical Ass'n, 121 F.3d 516, 520 (9th Cir. 1997). Misuse

27   only invalidates a copyright during the period of misuse. Id. at 520 & n.9. The Placements

28   Agreements, executed on May 22, 2002 between Affordable Video Systems and

1    Licensees Southgate Social Club and Galaxy Bingo, were valid only until May 13, 2004

2    "unless Licensee[s] notif[y] [American Software Development Company] and

3    [Affordable Video Systems] in writing at least 60 days prior to the termination period of

4    this Agreement." Dkt. 1, Exh. D ¶11, E ¶11. Because the Court cannot ascertain from the

5    parties' filings whether the Placement Agreements are still in force, summary judgment is

6    denied as to the defense of copyright misuse.

7               **Defendants' Motion to Modify the Preliminary Injunction**

8               Defendants moved to modify the Preliminary Injunction or increase the bond. Dkt.

9    127. Plaintiffs responded. Dkt. 123. Defendants replied. Dkt. 143.

10              The Court preliminarily enjoined Defendants from

11              manufacturing, displaying, distributing, offering for sale, selling, licensing,
                shipping, delivering, promoting, or advertising Quick Play Bingo or any other
12              game that is substantially similar to FAST ACTION BINGO or that has been
                developed using proprietary or confidential information provided by Dream Games
13              to PC Onsite.

14   Dkt. 67 at 13. The bond was set at $200,000.00. Dkts. 13, 67. Defendants argue that the

15   injunction has prevented them from providing software development for Fantasy Games,

16   LLC and Zingo Sales. Without providing any detailed description of the games that they

17   propose to develop, Defendants move that the Court prospectively exempt these games

18   from the injunction. Given the paucity of evidence concerning these games, the Court will

19   not modify the injunction or increase the bond based on the speculative profits that these

20   games may produce.

21   / / /

22              **Defendants' Second Motion for Partial Summary Judgment**

23              Defendants filed a Second Motion for Partial Summary Judgment, Dkt. 130, and

24   an accompanying Statement of Facts. Dkt. 131. Plaintiffs responded, Dkt. 144, and filed a

25   Statement of Facts, Dkt. 145. Defendants replied. Dkt. 146.

26              Defendants filed a Motion for leave to file a second motion for summary

27   judgment. Dkt. 150. Plaintiffs did not respond. The Court will grant Defendants leave to

28   file the Second Motion for Partial Summary Judgment *nunc pro tunc*.

Defendants argue that the standard to be applied in determining copyright infringement is "virtual identity," not "substantial similarity."

Infringement

"In order to establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. The latter element may be established by showing that the works in question are substantially similar in their protected elements and that the infringing party had access to the copyrighted work." Rice v. Fox Broadcasting Co., 330 F.3d 1170, 1174 (9th Cir. 2003) (internal citations and quotation marks omitted). Plaintiffs' copyright registration for Fast Action Bingo is "prima facie evidence of ownership." Dkt. 1, Exh. A; Johnson Controls, Inc. v. Phoenix Control Systems, Inc., 886 F.2d 1173, 1175 (9th Cir. 1989) (citing 17 U.S.C. § 410(c)). It is undisputed that Defendants had access to the screens of Fast Action Bingo.[3]

Extrinsic Test and Analytic Dissection

At the summary judgment stage, the Court applies the Ninth Circuit's "extrinsic" test to determine whether copying sufficient to constitute infringement has occurred. Apple Computer, Inc. v. Microsoft Corp. ("Apple"), 35 F.3d 1435, 1442 (9th Cir. 1994); Rice at 1174. "[T]he extrinsic test . . . objectively considers whether there are substantial similarities in both ideas and expression." Apple at 1442. "Because only those elements of a work that are protectable and used without the author's permission can be compared when it comes to the ultimate question of illicit copying, we use analytic dissection to determine the scope of copyright protection before works are considered as a whole." Id. at 1443 (citations omitted).

Analytic dissection is the process by which the Court determines which elements of a work are protectable by copyright and which elements are unprotectable. Id.

---

[3]Plaintiffs present evidence that Defendants also accessed the source code. See Report of Plaintiffs' Expert Scott Greene, Dkt. 131.

Protectable expression is then filtered through "the relevant limiting doctrines in the context of the particular medium involved, through the eyes of the ordinary consumer of that product." Id. At that point, "the court must define the scope of the plaintiff's copyright--that is, decide whether the work is entitled to 'broad' or 'thin' protection." Id. The "substantial similarity" test provides "broad" protection; the "virtual identity" test provides "thin" protection. Id. at 1442. The Court may grant thin protection even where some features of a work are copyrightable. Id. at 1447.

In some cases, a combination of unprotectable elements may receive thin copyright protection. This occurs only when "those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." Satava v. Lowry, 323 F.3d 805, 811 (9th Cir. 2003) (citing Apple at 1439, "[w]hen the range of protectable expression is narrow, the appropriate standard for illicit copying is virtual identity.").

After the extrinsic test, an "intrinsic," or "subjective" test is performed, "which measures substantial similarity in the "total feel and concept of the works." Idema v. Dreamworks, Inc., 162 F.Supp.2d 1129, 1177 (C.D.Cal. 2001) (citation omitted). "However, only the extrinsic test is generally employed at summary judgment, as the intrinsic test should generally be reserved for the ultimate finder of fact. Moreover, only the extrinsic test is necessary to a decision on summary judgment." Id. (citations and internal quotation marks omitted).

Ideas and their Expression

The law of copyright does not protect ideas themselves but only the expressions of those ideas. We begin with the relevant statute:

(a) Copyright protection subsists . . . in *original works of authorship fixed in any tangible medium of expression* . . . from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

(1) *literary works*;

- 9 -

* * *

(6) motion pictures and other *audiovisual works*;

(b) In no case does copyright protection for an original work of authorship extend to any *idea*, procedure, process, system, *method of operation*, concept, principle, or discovery. . .

17 U.S.C. § 102 (emphasis added); <u>see</u> <u>also</u> <u>Feist Publications, Inc. v. Rural Telephone Service Co., Inc.</u>, 499 U.S. 340, 349-50, 111 S.Ct. 1282, 1290 (1991) ("[C]opyright assures authors the right to their original expression, but encourages others to build freely upon the ideas . . . conveyed by a work.").

<u>Limiting Doctrines</u>

Several doctrines limit the scope of copyright protection. First, copyright protection does not extend to works in the "public domain." <u>Feist Publications</u>, 499 U.S. at 350, 111 S.Ct. at 1290; <u>cf.</u> <u>Bonito Boats, Inc. v. Thunder Craft Boats, Inc.</u>, 489 U.S. 141, 151, 109 S.Ct. 971, 977 (1989) ("[F]ree exploitation of ideas will be the rule, to which the protection of a federal patent is the exception."). "The mere fact that plaintiff used a matter in the public domain does not in and of itself preclude a finding of originality, since plaintiff may have added unique features to the matter so as to render it copyrightable." <u>Kamar Intern., Inc. v. Russ Berrie and Co.</u>, 657 F.2d 1059, 1061 (9th Cir. 1981).

Second, "when an idea and its expression are indistinguishable, or 'merged,' the expression will only be protected against nearly identical copying." <u>Apple</u> at 1444 (citation omitted). Third, under the closely related "scenes a faire" doctrine, there can be no infringement based on expression "which necessarily results from the fact that the common idea is only capable of expression in more or less stereotyped form." <u>Frybarger v. International Business Machines Corp.</u>, 812 F.2d 525, 530 (9th Cir. 1987) (citations and internal quotation marks omitted).

<u>Summary Judgment Standard</u>

"Because plaintiff bears the burden of proving that the works at issue are substantially similar in a copyright infringement case, summary judgment for defendant is appropriate when plaintiff fails to make a sufficient showing that the ideas and expressive elements of the works are substantially similar after defendant has properly identified in a motion for summary judgment that plaintiff has failed to do so." Frybarger v. International Business Machines Corp., 812 F.2d 525, 528 (9th Cir. 1987) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 2553-54 (1986)).

Computer Programs

Computer programs may receive copyright protection as literary works. Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1249 (3d Cir. 1983). This protection extends beyond the source code. "Whether the non-literal components of a program, including the structure, sequence and organization and user interface, are protected depends on whether, on the particular facts of each case, the component in question qualifies as an expression of an idea, or an idea itself." Johnson Controls, 886 F.2d at 1175; see also Computer Associates Intern., Inc. v. Altai, Inc., 982 F.2d 693, 702 (2d Cir. 1992) (computer programs are copyrightable literary works). The entire text of the computer program for Fast Action Bingo, Dkt. 47, is registered as a literary work. Dkt. 1, Exh. A.

In some circumstances, the structure of a computer program may be protected by copyright. "To the extent that there are many possible ways of accomplishing a given task or fulfilling a particular market demand, the programmer's choice of program structure and design may be highly creative and idiosyncratic. However, computer programs are, in essence, utilitarian articles–articles that accomplish tasks. As such, they contain many logical, structural, and visual display elements that are dictated by the function to be performed, by considerations of efficiency, or by external factors such as compatibility requirements and industry demands." Sega Enterprises Ltd. v. Accolade, Inc., 977 F.2d 1510, 1524 (9th Cir. 1992).

1    The Copyright Office automatically includes computer screen displays as part of

2    the copyright protection of the underlying computer program, even if, as here, the author

3    does not deposit identifying material for the screen. United States Copyright Office,

4    Circular 61, Copyright Registration for Computer Programs (July 2002). "The Register

5    has the authority to interpret the copyright laws and its interpretations are entitled to

6    judicial deference if reasonable." Batjac Productions Inc. v. GoodTimes HomeVideo

7    Corp., 160 F.3d 1223, 1231 (9th Cir. 1998) (quoting Marascalo v. Fantasy, Inc., 953 F.2d

8    469, 473 (9th Cir. 1991)). The Court finds the Register's policy on copyrighting screens

9    displays is reasonable and should be accorded judicial deference. See, e.g., Manufacturers

10   Technologies Inc. v. Cams, Inc., 706 F. Supp. 984 (D. Conn. 1989); cf. M. Kramer Mfg.

11   Co., Inc. v. Andrews, 783 F.2d 421, 442 (4th Cir. 1986) ("[A] copyright in the

12   audiovisual display, which display is created by a computer program, protects not only

13   the audiovisual from copying, but also the underlying computer program to the extent the

14   program embodies the game's expression.").

15        Video Games

16

17        Video games may receive copyright protection. For example, although the idea of

18   an electronic poker game is not protected, "the shape and characteristics of the cards and

19   the shapes, sizes, colors, sequences, arrangements and sounds [that] provides something

20   new or additional over the idea [of the game] are protected." M. Kramer Mfg. Co., Inc. v.

21   Andrews, 783 F.2d at 435.

22        The limiting doctrines of merger and scenes a faire have a special application in

23   the video game context. In Frybarger v. International Business Machines Corporation, the

24   Ninth Circuit upheld a district court's grant of summary judgment to the defendants in a

25   case involving a video game that allegedly infringed the plaintiff's copyright on a similar

26   video game. 812 F.2d at 527. Both games involved a protagonist trying to trap antagonists

27   by moving line segments on the screen to form a box-shaped "trap." Id. at 529 & n.2.

28

1   Although the two video games had "numerous similar features," the court of appeals held

2   that "each of the similar features constitutes a basic idea of the videogames and, to the

3   extent each feature is expressive, that the expression is as a practical matter indispensable,

4   or at least standard, in the treatment of a given idea." Id. at 530. The court further held

5   that "the mere *indispensable* expression of these ideas, based on the technical

6   requirements of the videogame medium, may be protected only against virtually identical

7   copying." Id. (emphasis in original).

8       Another case, Data East USA, Inc. v. Epyx, Inc., had a similar fact situation. 862

9   F.2d 204, 205 (9th Cir. 1988). There, the Ninth Circuit, applying merger and scenes a

10  faire, reversed the district court's grant of a permanent injunction to the plaintiff in a case

11  involving a karate tournament video game that allegedly infringed the plaintiff's

12  copyright. Relying on a list of several similar features of the two games, the district court

13  had found infringement. Reversing, the court of appeals found that these features

14  "encompass[ed] the idea of karate." Id. at 209.

15

16      These features, which consist of the game procedure, common karate moves, the
        idea of background scenes, a time element, a referee, computer graphics, and

17      bonus points, result from either constraints inherent in the sport of karate or
        computer restraints. After careful consideration and viewing of these features, we

18      find that *they necessarily follow from the idea of a martial arts karate combat
        game, or are inseparable from, indispensable to, or even standard treatment of the*

19      *idea of the karate sport.* As such, they are not protectable.

20  Id. at 209 (emphasis added); see also Atari, Inc. v. Amusement World, Inc., 547 F.Supp.

21  222, 224 (D.Md.  1981) (denying motion for preliminary injunction where similarities

22  between video games which involved spaceships combatting space rocks were inherent to

23  the idea of the game or required by the nature of the medium).

24      To the extent that they mimic reality, video games are only entitled to "thin"

25  protection. The Seventh Circuit, citing Data East USA, recently applied the virtual

26  identity standard to a golf video game. Incredible Technologies, Inc. v. Virtual

27  Technologies, Inc., 400 F.3d 1007 (7th Cir. 2005). Upholding the district court's denial of

28

1   a preliminary injunction, that court of appeals held that the accused work merely applied

2   features of real life golf to the video game format. Id. at 1015. Because both games drew

3   from the same idea of real life golf, with its sand traps, water holes, and other standard

4   features, it was inevitable that they were similar. The two games' similarity would only

5   run afoul of copyright laws if they were virtually identical.

6      "Methods of operation" are not entitled to copyright protection. 17 U.S.C. §

7   102(b). In Lotus Development Corporation v. Borland Intern., Inc., the First Circuit

8   applied this statutory limitation to a computer program, the Lotus 1-2-3 spreadsheet,

9   which performed accounting functions. 49 F.3d 807 (1st Cir. 1995). The court of appeals

10   defined "method of operation" as "the means by which a person operates something,

11   whether it be a car, a food processor, or a *computer*." Id. at 815 (emphasis added). The

12   Lotus 1-2-3 menu command hierarchy, with its 469 commands arranged into 50 menus

13   and submenus, was held to be an uncopyrightable method of operation, because it simply

14   provided "the means by which users control and operate Lotus 1-2-3." Id. The Lotus court

15   took no position on the copyrightability of the Lotus 1-2-3 screen displays. Lotus at 815

16   & n.10. The Apple court applied the same reasoning of Lotus to graphical user interfaces

17   to the extent that they were functional, although they could receive copyright protection

18   to the extent that they were artistic. Apple at 1444.

19      Analytic Dissection

20

21      Two versions of Quick Play Bingo are at issue in this case. The first version

22   ("Quick Play One") was the subject of the Court's hearings on the Temporary Restraining

23   Order. See Dkt. 4, Exh. B; Dkt. 145, Exh. 2 ("Deposition Exhibit 219"); Dkt. 145, Exh. 3

24   ("Deposition Exhibit 220"). Plaintiffs have presented evidence that Quick Play One was

25   distributed to several bingo halls. Dkt. 25 at 57; Dkt. 145 ¶ 8. Defendants aver that the

26   "final commercial version" of Quick Play Bingo ("Quick Play Two"), provided to the

27   Court on March 12, 2003, differs from Fast Action Bingo to an even greater degree. Dkt.

28

25 at 10; Dkt. 20; Dkt. 131, Exh. 4.[4] Plaintiffs argue that both versions of Quick Play

Bingo infringe their copyright. See Dkts. 131 (Expert Report of Scott Greene), 144.

Plaintiffs, in their Response to Defendants' second Motion for Summary Judgment,

argue that Defendants failed to present evidence that several features of Fast Action

Bingo and Quick Play Bingo stem from underlying features of the game of bingo itself.

Plaintiffs have the burden of putting forth evidence sufficient to establish an issue of

material fact. See Frybarger, 812 F.2d at 528 (citing Celotex, 477 U.S. at 323-24, 106

S.Ct. at 2553-54).

Plaintiffs must identify for the Court "concrete elements based on objective

criteria" so that the Court can determine which elements of the work are subject to

copyright protection. Three Boys Music Corp. v. Bolton, 212 F.3d 477, 485 (9th Cir.

2000). The Court compares Fast Action Bingo and both versions of Quick Play Bingo

with special reference to those aspects of the program discussed by Plaintiffs' expert Scott

Greene, Dkt. 131, the hearings and their related exhibits for the Temporary Restraining

Order and the Preliminary Injunction, and Plaintiffs' Response to Defendants' Second

Motion for Partial Summary Judgment.

/ / /

/ / /

Quick Play One and Fast Action Bingo

Plaintiffs' side-by-side comparison of Quick Play One and Fast Action Bingo

shows the administrative screens of each game. Dkt. 145, Exh. 3. The games contain

several similar functions. For example, in both games, one screen has buttons for "Menu,"

"Make Control# Available," "Log Out," "End Shift," "Redeem Control Number," "Print

---

[4]Plaintiffs aver that the attachment to Scott Greene's report, Dkt. 131, Exh. 4, represents Quick Play Two. Dkt. 145 ¶ 6. Scott Greene's report indicates that the version of Quick Play Bingo that he received from the Defendants on May 4, 2004 was labeled "QP Source 5/3/2004."

Sale," "Turn Sounds Off," and several up and down arrows for adjusting certain numerical values. Id. at 2. The layout of these functions on the screen is very similar. The color scheme is simple, usually a solid colored background with buttons or other features overlaid in a different color.

Likewise, the "System Menus" screens contain buttons for "Add User," "Delete User," "Get Detailed Information for a Player Control Number," "Sales Report Menu," "Security/System Access Report," "Games Menu," "System Settings Menu," and "Done". Id. at 4. That screen has a bar in the middle which reads "If the Function Button that you want to press is 'Grayed,' you do not have the correct security level. To access the function, logout and login with a[5] higher security level." Id. Several other administrative scenes contain nearly the same functions with the same or similar names, similar or identical text, similar or identical layout, and similar or identical color schemes. See Id. at 3-23, 26-29. The functions of a few screens differ somewhat. See Id. at 24, 25.

The administrative screens of Quick Play One and Fast Action Bingo have several functions in common. These functions, in and of themselves, are not copyrightable, because copyright protection does not extend to a "procedure, process, system, [or] method of operation. 17 U.S.C. § 102(b). Because the functions themselves are not copyrightable, neither are their names in many instances, because a given function (such as "Make Control# Available," or "End Shift") may not be describable in more than one or at most a few ways. See Lotus at 815 & n.9 ("[A] strong argument could be made that the brief explanations [that function titles] provide 'merge' with the underlying idea of explaining such functions."). In that circumstance, the idea and the expression of the idea are merged. Other functions, such as "Log Out," are so standard that they are not copyrightable under scenes a faire. Finally, the layout and the color scheme of the functions is not so original as to merit broad copyright protection. See Apple at 1447.

---

[5]Quick Play One does not have the word "a". Otherwise, the texts are identical.

1    However, even a combination of unprotectable elements may be entitled to some

2    protection. Satava v. Lowry, 323 F.3d at 811.

3              Quick Play Two and Fast Action Bingo

4              A.  *The game itself*

5

6    Both Fast Action Bingo and Quick Play Bingo are computerized bingo games

7    which are similarly played. For both games, players at a bingo parlor typically purchase

     the right to select a number of electronic cards to play on the computer. They can play

8    several cards on the same screen as the computer generates numbers to be played. The

9    cards are marked according to the numbers called, and players win money when the

10   numbers called form specified patterns on their cards. When finished, players can cash

11   out. Both games have a series of administrative screens (the "back end") by which the

12   bingo hall administrators operate and set parameters for the game and generate sales

13   reports.[6]

14

15   It is not surprising that two computerized versions of a real life bingo game are

16   similar. Like the karate and golf video games, most of the features of the video bingo

17   games are inherent to bingo itself or the constraints of a computer video game. Data East

18   USA, 862 F.2d at 205; Incredible Technologies, 400 F.3d 1007. The idea of a bingo video

19   game requires several features of bingo to be displayed on the screen: bingo cards; the

20   numbers (often printed on balls) which have been called, a key describing winning

21   patterns and the corresponding prizes, and the player's balance and winnings. See Dkt. 20,

22   Exh. A at 3, 5, 6. Bingo cards and numbers are in the public domain, and their

23   representation merges with the idea behind them. Likewise, the idea of a particular

24   winning combination is not copyrightable, because the idea and its expression are

25   merged. Most of the names of the winning combinations, such as "Block of Nine" and

26

27   ────────────────

28   [6]Quick Play Bingo, unlike Fast Action Bingo, has an on-line interface for remote
     report checking.

"Letter X", are either standard in the treatment of this subject or merely descriptive. "Because of these constraints, [bingo] is not susceptible of a wholly fanciful presentation." <u>Data East USA</u> at 209. Furthermore, the computer medium requires an orderly progression of play, screen by screen. A display of a player's balance and winnings on the screen is required by the nature of the medium.

When a player wins, a screen displays several information fields related to the win: the winning pattern, the prize, the player's "old balance," the number of cards that were selected, the "subtotal," and the player's "new balance." Dkt. 20, Exh. A at 7. These fields are merged with the idea of electronic bingo, and the names of the fields are in the public domain. At most, they may receive thin copyright protection for their arrangement on the screen. Further, a popup window appears on the win screen to explain how players can collect their winnings. At 8. The text of this field is entitled to thin protection.

### B.  *The Back-end of the game*

Several of the back-end screens in Quick Play Two, like the corresponding screens in Fast Action Bingo and Quick Play One, have several functions in common and may only receive thin protection for their arrangement on the screen and their color scheme. <u>See</u> Dkt. 20, Exh. A at 9, 14, 16, 17, 18, 25, 30, 31, 32, 35, 39, 40, 43, 46. Other back-end screens have some of the same functions, but several other functions may appear as tabs across the top of the screen to access different menus and submenus. <u>See</u> Id. at 10, 13, 15, 19, 20, 23, 24, 28, 33. Still others primarily display similar informational fields, with or without a different set of functions. <u>See</u> Id. at 11, 12, 15, 16, 21, 22, 23, 24, 25, 26, 27, 29, 47.

### C.  *The Scott Greene Report*

Plaintiffs' report by Scott Greene, a computer expert, discusses several similarities between Quick Play Two and Fast Action Bingo. Dkt. 131. He notes similarities in

execution of the programs, including certain message screens, and in terminology such as "Player Control Number," the terms used in ending shift reports, and errors in spelling. The terminology of Fast Action Bingo is entitled to some copyright protection.

Greene notes some similarities in source code. For example, the programs allegedly use similar security code algorithms at the back end for piracy protection. Even taking his inference of copying to be true, all copying of computer programs is not necessarily unlawful. "[C]omputer programs are, in essence, utilitarian articles–articles that accomplish tasks." Sega Enterprises Ltd. v. Accolade, Inc., 977 F.2d at 1524. To the extent that the allegedly copied source code is a "procedure, process, system, [or] method of operation," it is not copyrightable. 17 U.S.C. § 102(b). Plaintiff's have made no showing that the "programmer's choice of program structure and design" is original enough to warrant broad copyright protection. Id.

Virtual Identity Standard Applies

The Court, having considered which elements of Fast Action Bingo are protectable under the law of copyright and having applied the relevant limiting doctrines, holds that the virtual identity standard applies to this case. Defendants move that the Court make a finding that Quick Play Bingo is not virtually identical to Fast Action Bingo. The Court will leave that factual determination to the jury.

Attorney Fees

Defendants argue in their second Motion for Summary Judgment that Plaintiffs are barred from seeking attorney fees. Dkt. 131. Under the Copyright Act, there can be no award of attorney fees for any infringement "commenced after first publication of the work *and before* the effective date of its registration." 17 U.S.C. § 412(2) (emphasis added); see also Oddo v. Ries, 743 F.2d 630, 634 (9th Cir. 1984) (citing 17 U.S.C. § 412(2)). The parties agree that Fast Action Bingo was first published in March of 1998 and registered on November 27, 2002. Plaintiffs argue that they are entitled to attorney fees because Defendants allegedly commenced their infringement after the date of

1   registration. A material issue of fact exists as to whether Defendants infringed Plaintiffs'

2   copyright before November 27, 2002, because negotiations between the parties may not

3   have concluded until some time after October 2002, and Defendants may have been

4   copying Fast Action Bingo with Plaintiffs' permission until after the registration date. See

5   Dkt. 145 (Plaintiffs' Statement of Facts).

6   **Plaintiffs' Motion for Summary Judgment**

7   Plaintiffs filed a Motion for Summary Judgment, Dkt. 139, an accompanying

8   memorandum, Dkt. 141, and a Statement of Facts, Dkt. 142. Defendants responded, Dkt.

9   147, and filed a Statement of Facts, Dkt. 148. Plaintiffs replied, Dkt. 152, and filed a

10  Supplemental Statement of Facts, Dkt. 153.[7] No objections were filed to the Supplemental

11  Statement of Facts.

12  Plaintiffs move that the Court take the following action: strike Defendants' Second

13  and Third Affirmative Defenses of inequitable conduct and fraud upon the Copyright

14  Office; strike the Fourth Affirmative Defense alleging lack of ownership of the entire text

15  of Fast Action Bingo; strike the Fifth and Seventh Affirmative Defenses alleging that

16  Defendants lacked access to Fast Action Bingo and to confidential information of

17  Plaintiff Dream Games; strike the Sixth Affirmative Defense alleging that copyright in

18  software does not extend to screen displays; strike the Eighth and Ninth Affirmative

19  Defenses alleging laches and estoppel; dismiss Defendants' Second Counterclaim and

20  Third Party Complaint alleging tortious interference with Defendant PC Onsite's business

21  relationships; and dismiss Defendants' Third Counterclaim alleging that Dream Games

22  breached the implied covenant of good faith and fair dealing. Dkts. 141, 34 (Defendants'

23  "Answer, Counterclaims, and Third-Party Complaint").

24  Defendants do not oppose summary judgment on the Sixth, Eighth, or Ninth

25  Affirmative Defenses; nor do they oppose summary judgment on the Fifth Affirmative

26

27  [7]Plaintiffs' Supplemental Statement of Facts included a Declaration of Paul Vincent
    Perez. Dkt. 153, Exh. 12. Plaintiffs subsequently filed this same Declaration with the original
28  signature. Dkt. 157.

1    Defense's Sixth Paragraph, which alleges the Defendants lacked access to the source

2    code. Dkt. 147. The Court will enter summary judgment as to these Defenses.

3            Summary Judgment Standard

4            A court must grant summary judgment if the pleadings and supporting documents

5    viewed in the light most favorable to the non-moving party "show that there is no genuine

6    issue as to any material fact and that the moving party is entitled to judgment as a matter

7    of law." Fed.R.Civ.P. 56(c).

8        [T]he mere existence of some alleged factual dispute between the parties will not
         defeat an otherwise properly supported motion for summary judgment; the
9        requirement is that there be no genuine issue of material fact. . . . Only disputes
         over facts that might affect the outcome of the suit under the governing law will
10       properly preclude the entry of summary judgment.

11   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510 (1986). A

12   dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for

13   the nonmoving party." 477 U.S. at 248, 106 S.Ct. at 2510.  "[T]here is no issue for trial

14   unless there is sufficient evidence favoring the nonmoving party for a jury to return a

15   verdict for that party." 477 U.S. at 249, 106 S.Ct. at 2511.

16           "One of the principal purposes of the summary judgment rule is to isolate and

17   dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett, 477 U.S.

18   at 323-24, 106 S.Ct. at 2553. Accordingly, summary judgment must be granted to

19   Plaintiffs if Defendants "fail[] to make a showing sufficient to establish the existence of

20   an element essential to [Defendants'] case, and on which [Defendants] will bear the

21   burden of proof at trial." Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552.

22           The nonmoving party need not "produce evidence in a form that would be

23   admissible at trial in order to avoid summary judgment." Celotex, 477 U.S. at 324, 106

24   S.Ct. at 2553. However, "Rule 56(e) . . . requires the nonmoving party to go beyond the

25   pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories,

26   and admissions on file,' designate 'specific facts showing that there is a genuine issue for

27   trial.'" Id.

28           Inequitable Conduct and Fraud Upon the Copyright Office

1   Plaintiffs argue that the Court should strike the affirmative defenses of inequitable

2   conduct and fraud upon the Copyright Office. Defendants, in support of these defenses,

3   argue that Plaintiffs failed to disclose two alleged facts to the Copyright Office: first, that

4   Fast Action Bingo was based upon an existing paper bingo game; and second, that Fast

5   Action Bingo is illegal. Defendants have filed no evidence of the copyrighted paper bingo

6   game from which Fast Action Bingo is allegedly a derivative work.[8] Further, the fact that

7   Fast Action Bingo is arguably illegal under some circumstances in some jurisdictions

8   does not preclude it from receiving any copyright protection at all.

9   Defendants argue that the doctrine of copyright misuse precludes enforcement of

10   the Fast Action Bingo copyright. However, the defense of copyright misuse fails without

11   proof that the alleged copyright misuse is ongoing. Practice Management Information,

12   121 F.3d at 520 & n.9. The Court will strike Defendants' Second and Third Affirmative

13   Defenses because Defendants have failed to establish any genuine issue of material fact.

14   See Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552.

15   Lack of Ownership

16   Plaintiffs argue that the Court should strike the affirmative defense of Lack of

17   Ownership. Defendants argue that Plaintiffs do not own the Fast Action Bingo copyright

18   because the original software code was written by Joseph Zingale but not as a "work

19   made for hire." A "work made for hire" is "a work prepared by an employee within the

20   scope of his or her employment." 17 U.S.C. § 101. "In the case of a work made for hire,

21   the . . . person for whom the work was prepared is considered the author . . . and . . . owns

22   all of the rights comprised in the copyright." 17 U.S.C. § 201(b).

23   Zingale states in his Declaration that he wrote the code as an employee of Plaintiff

24   Perez at PVP Management Corporation, the predecessor of Plaintiff Dream Games. Dkt.

25   140, Exh. 4. Zingale's Declaration provides evidence, under the factors laid out in

26

27   ───────────────

28   [8]Plaintiffs pointed out Defendants' failure to provide proof of such a game before Defendants responded to Plaintiffs' Motion for Summary Judgment. Dkt. 144 at 4.

1   Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751, 109 S.Ct. 2166, 2178

2   (1989), that Fast Action Bingo is a work made for hire.

3        Defendants fail to establish a genuine issue of material fact as to this affirmative

4   defense. Plaintiff Perez's testimony that Zingale "could very well have been" an employee

5   of PVP when he wrote the Fast Action Bingo Code is not evidence that Zingale was not

6   an employee at that time and does not create a genuine issue of material fact. See Dkt.

7   153, Exh. 11. Further, Plaintiffs have offered evidence that records of Zingale's

8   employment are no longer available. Dkt. 153, Exh. 12.

9        No Access to Confidential Information

10        Plaintiffs move that the Court strike the Seventh Affirmative Defense. In this

11   defense, Defendants allege that they were never able to access any "confidential

12   information." Defendants argue that Plaintiffs have failed to present evidence that the

13   users of the back end of Fast Action Bingo were subject to any type of confidentiality

14   agreement. Plaintiffs have offered evidence that their Placement Agreement provides that

15   "Licensee shall not allow any third Party access to the System at any time." Dkt. 153 ¶57.

16   Summary judgment will be granted as to the Seventh Affirmative Defense.

17        Tortious Interference with Business Relationship and Expectancy

18        Plaintiffs move that the Court dismiss Defendants' Second Counterclaim and Third

19   Party Complaint alleging tortious interference with Defendant PC Onsite's business and

20   contractual relationship and business expectancy. Defendants' allegations concerning

21   Plaintiffs' allegedly exclusionary contract provisions with other parties and Plaintiffs'

22   allegedly bad faith conduct in this litigation are sufficient to establish an issue of material

23   fact. Because this is a fact-intensive issue best decided by the jury, the Court will deny

24   summary judgment on this issue.

25        Breach of the Implied Covenant of Good Faith and Fair Dealing

26        Plaintiffs argue that Defendants breached the implied covenant of good faith and

27   fair dealing by failing to abide by the Third Party Source Code Non-Disclosure

28   Agreement. Defendants allege that Plaintiffs failed to supply the Delphi software

necessary to utilize the CD ROM containing Fast Action Bingo. Because there is a factual dispute, summary judgment will be denied on this issue.

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Partial Summary Judgment, Dkt. 108, is **DENIED**.

**IT IS FURTHER ORDERED** Defendants' Motion to Modify Preliminary Injunction or increase the bond, Dkt. 127, is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for leave to file a second motion for summary judgment, Dkt. 150, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Second Motion for Partial Summary Judgment, Dkt. 130, is **GRANTED IN PART AND DENIED IN PART** as stated in this Order.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment, Dkt. 139, is **GRANTED IN PART AND DENIED IN PART** as stated in this Order.

**IT IS FURTHER ORDERED** setting a status hearing on **Thursday, September 22, 2005** at **3:45 p.m.**

DATED this 19th day of August, 2005.

Earl H. Carroll
United States District Judge